**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

SUSAN R. MCNEILLY, RON MEKKES )
and PHYLLIS M. WALKER, individually )
and on behalf of all others similarly )
situated, )
                             )
                Plaintiffs, ) **CLASS ACTION COMPLAINT**
                             )
     v. ) **CASE NO:**
                             )
SPECTRUM HEALTH SYSTEM, THE )
FINANCE & AUDIT COMMITTEE OF )
THE BOARD OF DIRECTORS OF )
SPECTRUM HEALTH SYSTEM, THE )
DEFINED CONTRIBUTION )
RETIREMENT PLAN INVESTMENT )
COMMITTEE OF SPECTRUM HEALTH )
SYSTEM and JOHN DOES 1-30. )
                             )
              Defendants. )

**COMPLAINT**

Plaintiffs Susan R. McNeilly, Ron Mekkes and Phyllis M. Walker ("Plaintiffs"), by and through their attorneys, on behalf of the Spectrum Health System 403(b) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Spectrum Health System ("Spectrum" or the "Company"), the Finance & Audit Committee of the Board of Directors of Spectrum Health System, and its

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

members during the Class Period[2] ("FAC") and the Defined Contribution Retirement Plan Investment Committee of Spectrum Health System and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002), *cert. denied*, 527 U.S. 1168 (2003). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B).

3.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

4.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

---

[2]  Class Period is defined below as September 4, 2014 through the date of judgment.

[3]  *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

5.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

6.      Although the Plan is a 403(b) Plan, it serves the same purpose as a 401(k) plan: as a vehicle for retirement savings.  Most participants in defined contribution plans like 401(k) or 403(b) plans expect that their accounts will be their principal source of income after retirement. Although at all times accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

7.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees,*" *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

8.      The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.  *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses* (July 2016), at 4.  "Any costs not paid by the employer, which may include

3

administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.*, at 5.

9.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their defined contribution plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

10.      At all times during the Class Period (September 4, 2014 through the date of judgment) the Plan had at least $1 billion dollars in assets under management.  At the end of 2017 and 2018, the Plan had over $1.63 billion dollars and $1.64 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.  The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.  In fact, according to data studied by BrightScope, an industry analyst, the Plan fell in the category of plans with the ***highest*** total plan cost for plans above $500 million in assets.[4]

11.      Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio

---

[4] *See* https://www.brightscope.com/401k-rating/552143/Spectrum-Health/572227/Spectrum-Health-System-403B-Plan/ (last visited September 4, 2020).

with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or materially similar investment options with lower costs and/or better performance histories.

12. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Their actions were contrary to the actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction over actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

15. This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16. Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial

part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.     PARTIES

**Plaintiffs**

17.     Plaintiff Susan R. McNeilly ("McNeilly") resides in Grand Ledge, Michigan. During her employment, Plaintiff McNeilly participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

18.     Plaintiff Ron Mekkes ("Mekkes") resides in Grand Rapids, Michigan.  During his employment, Plaintiff Mekkes participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

19.     Plaintiff Phyllis M. Walker ("Walker") resides in Park Forest, Illinois.  During her employment, Plaintiff Walker participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

21.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants

6

breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

22.     Spectrum Health System is the Plan sponsor and a named fiduciary. 2018 Form 5500 of the Spectrum Health System 403(b) Plan filed with the United States Department of Labor ("2018 Form 5500") at 1.  Its corporate headquarters is located at 100 Michigan Street Northeast, Grand Rapids, Michigan 49503.   Spectrum is a not-for-profit integrated health delivery system headquartered in Grand Rapids, Michigan. It operates 15 acute care hospitals, 12 urgent care location and 43 clinical laboratories clinics in western Michigan.[5] Spectrum Health currently has over 31,000 employees.[6] Spectrum Health reported that it's a $7.3 billion dollars enterprise. *Id.*

23.      Spectrum, acting through its Board of Directors "appointed the Defined Contribution Retirement Plan Investment Committee ("Committee") to select and monitor the investment options made available to participants … ." The Charter of the Investment Committee for the Spectrum Health System Defined Contribution Retirement Plans ("Charter") at 1.

24.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

25.     Additionally, at all times, Spectrum acted through its officers, including the Committee, to perform Plan-related fiduciary functions.

---

[5] https://www.spectrumhealth.org accessed on August 30, 2020.

[6] https://www.spectrumhealth.org/about-us accessed on August 30, 2020.

26.     Spectrum made discretionary decisions to make matching and non-elective contributions to the Plan. The December 31, 2018 Independent Auditor's Report of the Spectrum Health System 4013(b) Plan ("2018 Auditor Report") at 5. As detailed in the Auditor Report Spectrum "may make discretionary matching and discretionary nonelective contributions to employees … ." *Id.*

27.     For all the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Finance & Audit Committee Defendants**

28.     The Board appointed the Committee. As detailed in the Charter: "Spectrum Health's Board of Directors ("Board") has previously appointed the Defined Contribution Retirement Plan Investment Committee ("Committee") to select and monitor the investment options made available to participants … ." Charter at 1. In turn, the Board delegated its authority to oversee the Committee to the Finance & Audit Committee of the Board of Directors of Spectrum Health System ("FAC"). As detailed in the Charter: "[o]versight of the Committee is delegated by the Board to the FAC."

29.     Accordingly, FAC had the fiduciary duty to monitor and supervise the Committee while it performed its role as the fiduciary responsible for selection and monitoring of the Plan's investments.

30.     Each member of FAC during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

8

31.     FAC and its members during the Class Period are collectively referred to herein as the "FAC Defendants."

**Committee Defendants**

32.     The Committee is purportedly responsible for selecting and monitoring the investments in the Plan. However, as described in more detail below, the Committee failed to prudently carry out its fiduciary duties. As described in the Charter: "[t]he Committee will be the fiduciary responsible for selecting the investment options made available to the participants in the Plans and for monitoring their performance." Charter at 1. The Charter further details that the Committee also has the authority to change the investment options and investment providers at any time. *Id.* The Charter states: "[t]he Committee may change the investment options and investment providers as it deems appropriate." *Id.*

33.     The Charter further defines the Committee as a fiduciary. The charter states that the Committee must "act solely in the interests of participants and beneficiaries (the duty of undivided loyalty)." Charter at 2. The Committee must also act "for the exclusive purpose of providing plan benefits, or for defraying reasonable expenses of plan administration (the exclusive benefit rule)." *Id.* Again, as will be demonstrated below, the Committee failed to properly carry out these fiduciary duties to participants.

34.     In theory, the Committee is required to prudently select and monitor investment options and to ensure the Plan pays no more in expenses than is reasonable. Charter at 3. However, as will be discussed in more detail below, the Committee failed to prudently carry out these fiduciary duties. As detailed in its Charter the Committee is required to "[s]elect and monitor investment options for the Plans, and make changes as appropriate." *Id*. In addition, the Committee must "[o]btain information regarding all investment, record keeping and

9

administrative expenses for the Plans and determine whether those expenses are reasonable." *Id.* Again, the Committee failed to prudently carry out these fiduciary tasks.

35.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

36.     The Committee and members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Non-Defendant Fiduciaries**

**Stifel PearlStreet Investment Management**

37.     Upon information and belief, Stifel PearlStreet Investment Management ("Stifel") is the investment consultant hired to assist the Committee and Spectrum in their role in selecting and monitoring the Plan's investment options.  Stifel is listed on the 2018 Form 5500 and was paid $94,500 in compensation by the Plan in 2018.  *See* 2018 Form 5500 at 3.

38.     The firm describes itself as "West Michigan's premier provider of retirement plan advisory services for corporations and organizations."[7]

39.     Under the Charter, the "The investment advisor ("Advisor") serves as an objective, third-party professional retained to assist the Committee in managing the overall investment process. The Advisor is responsible for guiding the Committee through a disciplined and rigorous investment process to enable the Committee to meet its fiduciary responsibilities." Charter at 3.

40.     Although Stifel is a relevant party and likely to have information relevant to this action, it is not named as a defendant given that the Committee is ultimately "responsible for

---

[7] https://www.pearlstreetinvestmentmanagement.com accessed on September 2, 2020.

selecting the investment options made available to the participants in the Plans and for monitoring their performance." Charter at 1. Plaintiffs reserve the right to name Stifel as a defendant in the future if deemed necessary.

### Additional John Doe Defendants

41. To the extent that there are additional officers and employees of Spectrum who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Spectrum officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## IV. THE PLAN

42. Spectrum "established the Spectrum Health System 403(b) Plan for the purpose of providing retirement benefits to eligible Employees." The Spectrum Health System 403(b) Plan Document as Amended and Restated effective January 1, 2010 ("Plan Doc.") at 1. The Plan was "adopted effective January 1, 1999, and has been periodically amended. The Plan was most recently amended and restated effective January 1, 2009." *Id.*

43. The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. *See,* Plan Doc. at 106.

Specifically, the Plan Doc. provides that the Plan will qualify "in every aspect with the mandatory provisions of the Code and ERISA relating to defined contribution plans and Section 403(b) Plans." *Id*. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

### Eligibility

44.     As detailed in the 2018 Auditor Report: "[g]enerally, all eligible employees of the Plan Sponsor and affiliated entities who have adopted the Plan became participants on their hire date." 2018 Auditor Report at 6.

### Contributions and Vesting

45.     There are several types of contributions that can be added to a participant's account, including, but not limited to, an employee salary deferral contribution, an employer matching contribution and employer nonelective contributions. 2018 Auditor Report at 5. Participants can also roll over amounts from other qualified benefit or defined contribution plans. *Id*.

46.     Employees may make "voluntary contributions up to a maximum percentage of their annual compensation, subject to maximum tax-deferred limitations established by the Internal Revenue Code." *Id.*

47.     In its discretion, Spectrum may make matching contributions based on the amount contributed by each participant. Prior to July 1, 2020, Spectrum contributed 50 cents for every dollar contributed by a participant. Spectrum Health System 403(b) Plan Summary Plan Description ("SPD") at 7. As described in the SPD: "no matching contributions will be made with regard to voluntary contributions that exceed 4% of [a participant's] compensation for that pay period." *Id.* However, Spectrum exercised its discretionary authority over the Plan and

revoked all matching contribution beginning on July 1, 2020. *Id.* As stated in the SPD: "effective July 1, 2020, matching contributions are suspended until further notice." *Id.*

48.     From their first contribution to the Plan, participants "are immediately vested in employee voluntary and rollover contributions and any income or loss thereon." 2018 Auditor Report at 5. Vesting in the Company's contribution portion is based on years of continuous service.   "Vesting in the Plan Sponsor's contribution portion of their accounts, plus actual earnings thereon, is based on years of service. *Id.*

49.     Like other companies that sponsor defined contribution plans for their employees, Spectrum enjoys both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to defined contribution plans at the time when the contributions are made.  *See generally* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

50.     Spectrum also benefits in other ways from the Plan's matching program.  It is well-known that "[m]any employers match their employees' contributions to the 401(k) plan in order to help attract and retain talent at their company.  By hiring and retaining employees with a high-caliber of talent, [a company] may save money on training and attrition costs associated with unhappy or lower-performing workers."  *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

51.     Given the size of the Plan, Spectrum likely enjoyed a significant tax and cost savings from offering a match.

### The Plan's Investments

52.     Several investments were available to Plan participants for investment each year during the putative Class Period, including several Voya target date funds. The Committee

determines the appropriateness of the Plan's investment offerings and monitors investment performance. For 2018, the Plan offered 23 investment options, which included 20 mutual funds and 3 variable annuity life insurance contracts.

53.  The Plan's assets under management for all funds as of the end of 2018 was $1,645,963,812. 2018 Auditor Report at 3. From 2014 to 2017 the Plan's assets under management ranged from more than $1 billion dollars to $1.6 billion dollars.

***Plan Expenses***

54.  As detailed in the Plan Document, "The Plan's assets may be used to defray the reasonable expenses of administering the Plan." Plan Doc. at 39.

## V.    CLASS ACTION ALLEGATIONS

55.  Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[8]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between September 4, 2014 through the date of judgment (the "Class Period").

56.  The members of the Class are so numerous that joinder of all members is impractical. The 2018 Form 5500 filed with the Dept. of Labor lists 33,208 Plan "participants with account balances as of the end of the plan year." 2018 Form 5500 at 2.

57.  Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all

---

[8] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

58.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

        A.      Whether Defendants are/were fiduciaries of the Plan;

        B.      Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

        C.      Whether the Company and the FAC Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

        D.      The proper form of equitable and injunctive relief; and

        E.      The proper measure of monetary relief.

59.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

60.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of

separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

61.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.     DEFENDANTS LACKED A PRUDENT FIDUCIARY PROCESS

62.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan because:

> (a)     they were so named; and/or
>
> (b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or
>
> (c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or
>
> (d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

63.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent

ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

64.     During the Class Period, Defendants did not act in the best interests of the Plan participants.  Investments chosen for a plan are not to favor the fund provider over the plan's participants. Yet here, to the detriment of the Plan and its participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise not justified on the basis of their economic value to the Plan or Plan participants.

65.     In order to meet the necessary standard of expertise, plan fiduciaries must seek independent advice whenever they lack the ability (either because of a lack experience or skills, or a conflict of interest) to conduct a reasonable, independent investigation and evaluation of the plan's investments themselves.

66.     While it may be necessary to seek the advice of consultants like Stifel, reliance on such is not a complete defense to a charge of imprudence and absolute reliance on expert advice is ill-advised.

67.     The DOL has articulated three guiding principles for plan fiduciaries to follow in order to satisfy the fee-related duties under ERISA, including engaging in an objective process designed to elicit the information necessary to determine: (a) the qualifications of the manager or provider, (b) the quality of the investment or services, and (c) the reasonableness of the fees charged in light of the bundle of investment attributes and services provided, and the fees associated with comparable alternative investments or service providers.

68.     For purposes of evaluating the annual operating expenses of an investment, plan fiduciaries should obtain competitive pricing information (*i.e.*, fees charged by other comparable

investment funds to similarly situated plans).  This type of information can be obtained through mutual fund data services, such as Morningstar, or with the assistance of the plan's expert consultant.  However, for comparator information to be relevant for fiduciary purposes, it must be consistent with the size of the plan and its relative bargaining power.  Very large plans are able to qualify for lower fees on a per participant basis, and comparators should reflect this fact.

69.    Plaintiffs have reviewed the Committee's quarterly meetings in 2019 and the first 2020 quarterly meeting during February 2020.  Plaintiffs do not have access to meeting minutes from prior years, but review of the handful of meeting minutes they have obtained demonstrate plausibly that the Committee did not employ a prudent process in monitoring Plan investments.

70.    Importantly, the Committee did not document any effort to give adequate attention to the high investment management fees charged by several of the Plan's investments, especially those managed by Voya.  The investment management fees charged by Voya for these funds were excessive in relation to comparable or nearly-identical alternatives. Materials reviewed at the Committee meetings focused primarily on fund performance and provided little information about the investment management fees being charged by the Plan's investments. The Committee did not meaningfully review the investment management fees charged for the Plan's investments as indicated by the absence of discussions in meeting minutes about these fees, their benchmarks or the source for the benchmarks.

71.    There is also no documentation to indicate the Committee investigated whether the actively managed mutual funds in the Plan's investment lineup provided sufficiently greater benefits over available index fund alternatives to offset the higher costs of the actively managed funds.  Nor is there evidence that the Committee ever conducted a Plan-wide comparison of the Plan's actively managed mutual funds with alternative index funds that were available to the

Plan.  The Committee's failure to meaningfully consider replacing the Plan's actively managed mutual fund options resulted in Plan participants paying much higher investment fees than was necessary.

72.     Also, to the extent the Committee chose and/or failed to remove higher cost shares of investment funds, the meeting minutes do not document the reasoning for doing so.

73.     Based on reasonable inferences from these facts, as well as others set forth below, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.  In sum, Defendants failed to leverage the size of the Plan to negotiate for: (1) lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period; and (2) a prudent payment arrangement with regard to the Plan's recordkeeping and administrative fees.

74.      As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## VII.    SPECIFIC ALLEGATIONS REGARDING THE PLAN'S COSTS

### A.    Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds

75.      Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the Plan and participants' assets because of unnecessary costs.

19

76.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

77.     Investment options have a fee for investment management and other services. With regards to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets. For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets. However, the expense ratio also reduces the participant's return and the compounding effect of that return. This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

78.     When jumbo plans, particularly those with over a billion dollars in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

20

79.     One indication of Defendants' failure to prudently monitor the Plan's funds is that the Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.

80.     Another indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (plans having over 1 billion dollars in assets).

81.     In 2018, for example, the majority of funds in the Plan (at least 14 out of the 20 mutual funds[9] or more than 70%) had expense ratios well above the median expense ratios for similarly sized plans.

82.     The expense ratios for funds in the Plan in some cases had a difference of up to *93%* (in the case of the Baron Growth Fund I) and a *77%* difference (in the case of Victory Small Company Opp I) above the median expense ratios in the same category: [10]

| Fund in the Plan | Exp Ratio[11] | Investment Style | ICI Median |
|---|---|---|---|
| Voya Solution 2025 Port Inst Fund | 0.74% | Target Date | 0.36% |
| Voya Solution 2035 Port Inst Fund | 0.77% | Target Date | 0.36% |
| Voya Solution 2045 Port Inst Fund | 0.80% | Target Date | 0.36% |

---

[9] While the 2018 and 2017 Form 5500s reference funds offered in connection with Newport Trust these funds appear to have a *de minimis* amount invested in them and may have been brought into the Plan as part of a merger and will be phased out in 2019.

[10] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019) (hereafter, "ICI Study") available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf

[11]  The listed expense ratios are taken from summary prospectuses published in 2020.

| Fund in the Plan | Exp Ratio[11] | Investment Style | ICI Median |
|---|---|---|---|
| Voya Solution 2055 Port Inst Fund | 0.80% | Target Date | 0.36% |
| Voya Solution Income Fund I | 0.68% | Target Date | 0.36% |
| Voya T Rowe Price Cp AprPt I | 0.64% | Domestic Equity | 0.39% |
| Baron Growth Fund I | 1.03% | Domestic Equity | 0.39% |
| Victory Small Company Opp I | 0.88% | Domestic Equity | 0.39% |
| Alliance Bernstein Small Cap Growth Z | 0.82% | Domestic Equity | 0.39% |
| Mass Investors Growth R4 | 0.49% | Domestic Equity | 0.39% |
| Pioneer Equity Income Y | 0.73% | Domestic Equity | 0.39% |
| (Invesco) Oppenheimer Dev Market Y | 1.00% | Other Mutual Funds | 0.56% |
| Voya Clarion Real Estate Prt I | 0.71% | Other Mutual Funds | 0.56% |
| Voya Global Bond I | 0.63% | Other Mutual Funds | 0.56% |

83.    The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI Median fee is based on a study conducted in 2016 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for domestic equity funds for 403(b) plans with over 1 billion dollars in assets was 0.43% using 2015 data compared with 0.39% in 2016.  Accordingly, the median expense ratios in 2020, or for that matter 2019, utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2019 expense ratios utilized in the above chart for the Plan's funds and the median expense ratios in the same category.

84.    Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan's funds because many prudent alternative funds were available that offered lower expenses than the median.

### Failure to Utilize Lower Fee Share Classes

85.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at

smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally 1 million or more, and therefore greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

86.     Jumbo defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a jumbo plan adding the fund in question to the plan as a designated investment alternative. Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

87.     Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

88.     Here, had the Plan's fiduciaries been faithfully reviewing the Plan's funds "quarterly to ensure they [were] meeting their established standards," SPD at 12, as they should have been, they would have selected the lower-priced identical funds.

89. As demonstrated by the chart below, in several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds and annuity products. The chart below uses 2020 expense ratios to demonstrate how much more expensive the funds were than their identical counterparts:

| Plan Investment | Current ER | Identical Lower Cost ER | Identical Lower Cost ER | Excess |
|---|---|---|---|---|
| Pioneer Strategic Income Y | 0.72% | Pioneer Strategic Income K | 0.62% | 15% |
| Mass Investors Growth R4 | 0.49% | Mass Investors Growth R6 | 0.38% | 25% |
| Pioneer Equity Income Y | 0.73% | Pioneer Equity Income K | 0.63% | 15% |
| Prudential High Yield Fund Z | 0.55% | Prudential High Yield Fund R6 | 0.42% | 8% |
| (Invesco) Oppenheimer Dev Market Y | 1.00% | (Invesco) Oppenheimer Dev Market R6 | 0.83% | 19% |
| Voya T Rowe Price Cp AprPt I[12] | 0.64% | T Rowe Price Cp AprPt I | 0.59% | 8% |
| Baron Growth Fund I | 1.03% | Franklin Small-Mid Cap Growth R6 | 0.50% | 69% |

90. The above is for illustrative purposes only. At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

91. Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds. However, it is common knowledge that investment minimums are often waived for jumbo plans like the Plan. *See, e.g., Davis et al. v. Washington Univ. et al.*, 960

---

[12] Voya T Rowe Price Cp AprPt I is an annuity product offered by T. Rowe Price. T Rowe Price Cp AprPt I is identical to Voya T Rowe Price Cp AprPt I except that it has a higher expense ratio and includes the Voya name. There's no justifiable excuse for using the Voya product when an identical alternative was available.

F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).  The individual fund and combined funds assets under management easily qualified them for lower share classes.  The following is a sampling of the assets under management as of the end of 2018:

| Current Fund | 2018 Assets Under Management |
|---|---|
| Pioneer Strategic Income Y | $10,286,271 |
| Mass Investors Growth R4 | $148,391,880 |
| Pioneer Equity Income Y | $47,934,216 |
| Prudential High Yield Fund Z | $8,814,099 |
| (Invesco) Oppenheimer Dev Market Y | $10,963,113 |
| Voya T Rowe Price Cp AprPt I | $140,888,144 |
| Baron Growth Fund I | $51,355,842 |

92.    A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.

93.    There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment. Defendants have no reasonable excuse for not knowing about the immediate availability of these lower cost share classes.  Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

94.    It is not prudent to select higher cost versions of the same fund even if a fiduciary believes – as it appears Defendants here did - fees charged to plan participants by the "retail"

class investment were the same or better as the fees charged by the "institutional" class investment, net of the "revenue sharing" paid by the funds to defray the Plan's recordkeeping costs. *Tibble III*, 2017 WL 3523737, at * 8. Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing." *Id.* at * 11.

95.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

96.     Spectrum's retirement plan is large and has scale which affords the Plan fiduciaries the opportunity to negotiate for lower recordkeeping costs and get access to the same investments with lower expense ratios which benefit the plan participants because the returns are higher and compounding greater.

97.     It is important to note that to the investment provider, a portion of the expense ratio is considered revenue, and possibly to the record-keeper as well, but is a detriment to the participant's return because it reduces it and the compounding effect.

98.     The arrangement of placing revenue sharing funds into a revenue account before disbursement to pay for Plan expenses deprived Plan participants of use of their money and millions of dollars in lost opportunity costs.

99.     In other words, a more prudent arrangement in this case, also more transparent and easier to comprehend by participants, would have been to take advantage of the Plan's scale by selecting available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration fees.

100.    By failing to investigate the use of lower cost share classes Defendants caused the Plan to pay millions of dollars per year in unnecessary fees. Further, to the extent Defendants held revenue sharing amounts for a prolonged period of time and failed to remit any excess revenue sharing back to Plan participants, this was a further fiduciary breach that cost Plan participants millions of dollars during the Class Period.

### *Failure to Utilize Lower Cost Passively Managed and Actively Managed Funds*

101.    As noted *supra*, ERISA is derived from trust law.  *Tibble*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  Restatement (Third) of Trusts § 100 cmt. b(1).

102.    While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds:  Study*,  available  at  http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-

managed-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

103.    Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

104.    During the Class Period, Plan meeting minutes demonstrate Defendants failed to adequately consider materially similar but cheaper alternatives to the Plan's investment options. This failure is a further indication that Defendants lacked a prudent investment monitoring process.

105.    The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style.  The chart below uses 2019 expense ratios as a methodology to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts.

| Plan Investment | Exp. Ratio | Passive/Active Lower Cost Alternative[13] | Exp. Ratio | % Fee Excess |
|---|---|---|---|---|
| Voya Solution 2025 Port Inst Fund | 0.74% | Vanguard Target 2025 Invs | 0.13% | 140% |
| | | JPMorgan SmartRetirement 2025 R6 | 0.47% | 45% |
| | | | | |
| Voya Solution 2035 Port Inst Fund | 0.77% | Vanguard Target 2035 Invs | 0.14% | 138% |
| | | JPMorgan SmartRetirement 2035 R6 | 0.48% | 46% |
| | | | | |
| Voya Solution 2045 Port Inst Fund | 0.80% | Vanguard Target 2045 Invs | 0.15% | 137% |
| | | JPMorgan SmartRetirement 2045 R6 | 0.50% | 46% |
| | | | | |
| Voya Solution 2055 Port Inst Fund | 0.80% | Vanguard Target 2055 Invs | 0.15% | 137% |
| | | JPMorgan SmartRetirement 2055 R6 | 0.49% | 48% |
| | | | | |
| Mass Investors Growth R4 | 0.49% | Vanguard Russell 1000 Growth Index I | 0.07% | 150% |
| | | Vanguard Windsor II Adm shares | 0.26% | 95% |
| | | | | |
| (Invesco) Oppenheimer Dev Market Y | 1.00% | Blackrock Em Mkts I | 0.87% | 14% |
| | | | | |
| Baron Growth Fund I | 1.03% | Vanguard Mid Cap Growth Index Adm | 0.07% | 175% |

[13] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second).  Where only one fund is listed, index funds are identified by the word "index" following the fund name.  Actively managed funds don't have this designation.

| Plan Investment | Exp. Ratio | Passive/Active Lower Cost Alternative[13] | Exp. Ratio | % Fee Excess |
|---|---|---|---|---|
| | | Franklin Small-Mid Cap Growth R6 (1 mil min) | 0.50% | 69% |

106.    In addition to the lower cost better performing alternatives listed in the chart above, Voya, the Plan's current recordkeeper,[14] offers lower cost better performing alternatives to the target date funds in the Plan. Since Voya was the Plan's recordkeeper, there's no reason why the Plan wouldn't have sought to add these lower cost alternatives at their earliest opportunity. While the alternative target date funds discussed in the Chart above would have been a better choice due to their lower cost, the fact that nearly identical target date funds were available from Voya, the Plan's own recordkeeper, further demonstrates the fiduciary failures of the Plan's fiduciaries.

| Plan Investment | Exp. Ratio | Passive/Active Lower Cost Alternative | Exp. Ratio | % Fee Excess |
|---|---|---|---|---|
| Voya Solution 2025 Port Inst Fund | 0.74% | Voya Index Solution 2025 Port Z | 0.19% | 118% |
| | | Voya Target Retirement 2025 I | 0.52% | 35% |
| | | | | |
| Voya Solution 2035 Port Inst Fund | 0.77% | Voya Index Solution 2035 Port Z | 0.19% | 121% |
| | | Voya Target Retirement 2035 I | 0.50% | 43% |
| | | | | |
| Voya Solution 2045 Port Inst Fund | 0.80% | Voya Index Solution 2045 Port I | 0.39% | 69% |
| | | Voya Target Retirement 2045 I | 0.50% | 46% |
| | | | | |
| Voya Solution 2055 Port Inst Fund | 0.80% | Voya Index Solution 2055 Port I | 0.39% | 69% |
| | | Voya Target Retirement 2055 I | 0.52% | 42% |

---

[14] In the SPD, Voya states that: "Voya is the only active investment provider for the Plan and is the recordkeeper of the Plan." SPD at 2.

107.    There is no good-faith explanation for utilizing high-cost share classes when nearly identical lower-cost target date funds were available. This is especially relevant in this action given that Voya was the Plan's recordkeeper.  Thus, Defendants have no reasonable excuse for not knowing about the immediate availability of Voya's nearly identical lower cost target date funds.  Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

108.    The above alternative funds had better performances than the Plan's funds in their 3 and 5 year average returns as of 2020.  Moreover, these alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial.

109.    With regard to the comparison of the actively managed funds to passively managed funds, these results are not surprising given that in the long-term, actively managed funds do not outperform their passively-managed counterparts.  Indeed, the majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019:[15]

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark  5 Yr (%) |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 |
| Mid-Cap | S&P MidCap 400 | 63.56 |
| Small-Cap | S&P SmallCap 600 | 75.09 |
| Multi-Cap | S&P Composite 1500 | 82.79 |

---

[15] Source: https://us.spindices.com/spiva/#/reports

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark  5 Yr (%) |
|---|---|---|
| Domestic Equity | S&P Composite 1500 | 81.66 |
| Large-Cap Value | S&P Value | 84.74 |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 |

110.     A prudent investigation would have revealed the existence of these lower-cost and better performing alternatives to the Plan's funds.

111.     The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period.  The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

112.     Defendants' failure to investigate lower cost alternative investments (both actively and passively managed funds) during the Class Period cost the Plan and its participants millions of dollars.

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against the Committee)

113.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

114.     At all relevant times, the Committee and its members ("Prudence/Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

115.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the

assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

116.    The Prudence/Loyalty Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.  Instead, the Prudence/Loyalty Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence/Loyalty Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.

117.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

118.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence/Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

119.    The Prudence/Loyalty Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit

breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Spectrum and the FAC)

120. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

121. Spectrum and the FAC (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

122. In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

123. The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

124. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which Plan investments were evaluated and their failure to investigate the availability of lower-cost share classes; and

(c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

125.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

126.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

36

G.   An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.   Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.   An award of pre-judgment interest;

J.   An award of costs pursuant to 29 U.S.C. § 1132(g);

K.   An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.   Such other and further relief as the Court deems equitable and just.


Dated: September 4, 2020                    Respectfully submitted,

                                            **ANTHONY L. DELUCA, PLC**

                                            */s/ Anthony L. Deluca*                    .
                                            Anthony L. DeLuca (P-64874)
                                            14950 East Jefferson Avenue, Suite 170
                                            Gross Pointe Park, MI 48230
                                            anthony@aldplc.com
                                            (313) 821-5905
                                            Fax (313) 821-5906


                                            **CAPOZZI ADLER, P.C.**

                                            By: */s/ Donald R. Reavey*            .
                                            Donald R. Reavey, Esquire
                                            (*Pro Hac admission to be requested*)
                                            PA Attorney ID #82498
                                            2933 North Front Street

Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

By: /s/ *Mark K. Gyandoh*               .
Mark K. Gyandoh, Esquire
PA Attorney ID #88587
(*Pro Hac admission to be requested*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class