# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SUSAN R. MCNEILLY, RON MEKKES and PHYLLIS M. WALKER, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) **AMENDED CLASS ACTION** |
| v. | ) **COMPLAINT** ) |
| SPECTRUM HEALTH SYSTEM, THE DEFINED CONTRIBUTION RETIREMENT PLAN INVESTMENT COMMITTEE OF SPECTRUM HEALTH SYSTEM and JOHN DOES 1-30. | ) ) **CASE NO:   1:20-CV-00870** ) ) ) |
| Defendants. | ) ) |

Plaintiffs Susan R. McNeilly, Ron Mekkes and Phyllis M. Walker ("Plaintiffs"), by and through their attorneys, on behalf of the Spectrum Health System 403(b) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.      INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Spectrum Health System ("Spectrum" or the "Company") and the Defined Contribution Retirement Plan Investment Committee of Spectrum Health System and its members during the Class Period[2] ("Committee") for breaches of their fiduciary duties.

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2]  Class Period is defined below as September 4, 2014 through the date of judgment.

1

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B).  These twin fiduciary duties are "the highest known to the law." *Griffin v. Flagstar Bancorp, Inc.*, 492 F. App'x 598, 603 (6th Cir. 2012).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees,*" *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource- center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

6.     Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.     Although the Plan is a 403(b) Plan, it serves the same purpose as a 401(k) plan: as a vehicle for retirement savings.  Most participants in defined contribution plans like 401(k) or 403(b) plans expect that their accounts will be their principal source of income after retirement.  Although at all times accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their defined contribution plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

9.     At all times during the Class Period (September 4, 2014 through the date of judgment) the Plan had at least $1 billion dollars in assets under management.  At the end of 2017 and 2018, the Plan had over $1.63 billion dollars and $1.64 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

10.     The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.  In fact,

according to data studied by BrightScope, an industry analyst, the Plan fell in the category of plans with the *highest* total plan cost for plans above $500 million in assets.[4]

11.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; (2)  maintaining certain funds in the Plan despite the availability of identical or materially similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping costs.

12.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to the actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction over actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

---

[4] *See* https://www.brightscope.com/401k-rating/552143/Spectrum-Health/572227/Spectrum-Health-System-403B-Plan/ (last visited September 4, 2020).

15.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.     PARTIES

**<u>Plaintiffs</u>**

17.     Plaintiff Susan R. McNeilly ("McNeilly") resides in Grand Ledge, Michigan.  During her employment, Plaintiff McNeilly participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

18.     Plaintiff Ron Mekkes ("Mekkes") resides in Grand Rapids, Michigan.   During his employment, Plaintiff Mekkes participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

19.     Plaintiff Phyllis M. Walker ("Walker") resides in Park Forest, Illinois.   During her employment, Plaintiff Walker participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their

accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

21.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

22.     Spectrum Health System is the Plan sponsor and a named fiduciary. 2018 Form 5500 of the Spectrum Health System 403(b) Plan filed with the United States Department of Labor ("2018 Form 5500") at 1.  Its corporate headquarters is located at 100 Michigan Street Northeast, Grand Rapids, Michigan 49503. Spectrum is a not-for-profit integrated health delivery system headquartered in Grand Rapids, Michigan. It operates 15 acute care hospitals, 12 urgent care locations and 43 clinical laboratories clinics in western Michigan.[5] Spectrum Health currently has over 31,000 employees.[6] Spectrum Health reported that it is a $7.3 billion dollars enterprise. *Id.*

23.      Spectrum, acting through its Board of Directors "appointed the Defined Contribution Retirement Plan Investment Committee ("Committee") to select and monitor the investment options made available to participants … ." The Charter of the Investment Committee for the Spectrum Health System Defined Contribution Retirement Plans ("Charter") at 1.

---

[5] https://www.spectrumhealth.org accessed on August 30, 2020.

[6] https://www.spectrumhealth.org/about-us accessed on August 30, 2020.

6

24.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

25.     Additionally, at all times, Spectrum acted through its officers, including the Committee, to perform Plan-related fiduciary functions.

26.      Spectrum made discretionary decisions to make matching and non-elective contributions to the Plan. The December 31, 2018 Independent Auditor's Report of the Spectrum Health System 403(b) Plan ("2018 Auditor Report") at 5. As detailed in the Auditor Report Spectrum "may make discretionary matching and discretionary nonelective contributions to employees … ." *Id.*

27.     For all the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Committee Defendants**

28.     The Committee is purportedly responsible for selecting and monitoring the investments in the Plan. However, as described in more detail below, the Committee failed to prudently carry out its fiduciary duties. As described in the Charter: "[t]he Committee will be the fiduciary responsible for selecting the investment options made available to the participants in the Plans and for monitoring their performance." Charter at 1. The Charter further details that the Committee also has the authority to change the investment options and investment providers at any time. *Id.* The Charter states: "[t]he Committee may change the investment options and investment providers as it deems appropriate." *Id.*

29.     The Charter further defines the Committee as a fiduciary. The charter states that the Committee must "act solely in the interests of participants and beneficiaries (the duty of undivided loyalty)." Charter at 2. The Committee must also act "for the exclusive purpose of providing plan benefits, or for defraying reasonable expenses of plan administration (the exclusive benefit rule)." *Id.* Again, as will be demonstrated below, the Committee failed to properly carry out these fiduciary duties to participants.

30.     In theory, the Committee is required to prudently select and monitor investment options and to ensure the Plan pays no more in expenses than is reasonable. Charter at 3. However, as will be discussed in more detail below, the Committee failed to prudently carry out these fiduciary duties. As detailed in its Charter the Committee is required to "[s]elect and monitor investment options for the Plans, and make changes as appropriate." *Id*.  In addition, the Committee must "[o]btain information regarding all investment, record keeping and administrative expenses for the Plans and determine whether those expenses are reasonable." *Id.* Again, the Committee failed to prudently carry out these fiduciary tasks.

31.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

32.     The Committee and members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Non-Defendant Fiduciaries**

**Stifel PearlStreet Investment Management**

33.     Upon information and belief, Stifel PearlStreet Investment Management ("Stifel") is the investment consultant hired to assist the Committee and Spectrum in their role in selecting and monitoring the Plan's investment options.  Stifel is listed on the 2018 Form 5500 and was paid $94,500 in compensation by the Plan in 2018.  *See* 2018 Form 5500 at 3.

34.     The firm describes itself as "West Michigan's premier provider of retirement plan advisory services for corporations and organizations."[7]

35.     Under the Charter, the "The investment advisor ("Advisor") serves as an objective, third-party professional retained to assist the Committee in managing the overall investment process. The Advisor

---

[7] https://www.pearlstreetinvestmentmanagement.com accessed on September 2, 2020.

8

is responsible for guiding the Committee through a disciplined and rigorous investment process to enable the Committee to meet its fiduciary responsibilities." Charter at 3.

36.     Although Stifel is a relevant party and likely to have information relevant to this action, it is not named as a defendant given that the Committee is ultimately "responsible for selecting the investment options made available to the participants in the Plans and for monitoring their performance." Charter at 1. Plaintiffs reserve the right to name Stifel as a defendant in the future if deemed necessary.

**Additional John Doe Defendants**

37.     To the extent that there are additional officers and employees of Spectrum who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Spectrum officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## IV.     THE PLAN

38.     Spectrum "established the Spectrum Health System 403(b) Plan for the purpose of providing retirement benefits to eligible Employees." The Spectrum Health System 403(b) Plan Document as Amended and Restated effective January 1, 2010 ("Plan Doc.") at 1. The Plan was "adopted effective January 1, 1999, and has been periodically amended. The Plan was most recently amended and restated effective January 1, 2009." *Id.*

39.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA Section  3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income,

expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  *See,* Plan Doc. at 106.  Specifically, the Plan Doc. provides that the Plan will qualify "in every aspect with the mandatory provisions of the Code and ERISA relating to defined contribution plans and Section 403(b) Plans." *Id*. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

***Eligibility***

40.      As detailed in the 2018 Auditor Report: "[g]enerally, all eligible employees of the Plan Sponsor and affiliated entities who have adopted the Plan became participants on their hire date." 2018 Auditor Report at 6.

***Contributions and Vesting***

41.      There are several types of contributions that can be added to a participant's account, including, but not limited to, an employee salary deferral contribution, an employer matching contribution and employer nonelective contributions. 2018 Auditor Report at 5.  Participants can also roll over amounts from other qualified benefit or defined contribution plans.  *Id*.

42.      Employees may make "voluntary contributions up to a maximum percentage of their annual compensation, subject to maximum tax-deferred limitations established by the Internal Revenue Code." *Id.*

43.      In its discretion, Spectrum may make matching contributions based on the amount contributed by each participant. Prior to July 1, 2020, Spectrum contributed 50 cents for every dollar contributed by a participant. Spectrum Health System 403(b) Plan Summary Plan Description ("SPD") at 7. As described in the SPD: "no matching contributions will be made with regard to voluntary contributions that exceed 4% of [a participant's] compensation for that pay period." *Id.* However, Spectrum exercised its discretionary authority over the Plan and revoked all matching contributions beginning on July 1, 2020. *Id.*

As stated in the SPD: "effective July 1, 2020, matching contributions are suspended until further notice." *Id.*

44.     From their first contribution to the Plan, participants "are immediately vested in employee voluntary and rollover contributions and any income or loss thereon." 2018 Auditor Report at 5. Vesting in the Company's contribution portion is based on years of continuous service.  "Vesting in the Plan Sponsor's contribution portion of their accounts, plus actual earnings thereon, is based on years of service. *Id.*

45.     Like other companies that sponsor defined contribution plans for their employees, Spectrum enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to defined contribution plans at the time when the contributions are made.  *See generally* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

46.     Spectrum also benefits in other ways from the Plan's matching program.  It is well-known that "[m]any employers match their employees' contributions to the 401(k) plan in order to help attract and retain talent at their company.  By hiring and retaining employees with a high-caliber of talent, [a company] may save money on training and attrition costs associated with unhappy or lower-performing workers." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

47.     Given the size of the Plan, Spectrum likely enjoyed a significant tax and cost savings from offering a match.

***The Plan's Investments***

48.     Several investments were available to Plan participants for investment each year during the putative Class Period, including several Voya target date funds. The Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance.  For 2018, the

Plan offered 23 investment options, which included 20 mutual funds and 3 variable annuity life insurance contracts.

49.     The Plan's assets under management for all funds as of the end of 2018 was $1,645,963,812. 2018 Auditor Report at 3.  From 2014 to 2017 the Plan's assets under management ranged from more than $1 billion dollars to $1.6 billion dollars.

***Plan Expenses***

50.      As detailed in the Plan Document, "The Plan's assets may be used to defray the reasonable expenses of administering the Plan." Plan Doc. at 39.

## V.     CLASS ACTION ALLEGATIONS

51.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[8]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between September 4, 2014 through the date of judgment (the "Class Period").

52.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 filed with the Dept. of Labor lists 33,208 Plan "participants with account balances as of the end of the plan year."  2018 Form 5500 at 2.

53.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the

---

[8] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

54. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plan;

B. Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C. Whether the Company failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

55. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

56. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

57.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.    THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

58.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

59.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

60.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds and agreement to recordkeeping and administration fees throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

### A.    Defendants Lacked a Prudent Fiduciary Process to Evaluate the Plan's Fees

61.     In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [9]

---

[9] *See https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf* ("DOL 408(b)(2) Regulation Fact Sheet")

62.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

63.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet.

64.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[10]

65.     Fiduciaries "should develop and follow a deliberative process for evaluating the reasonableness of fees.  This includes understanding the sources, amounts, and nature of recordkeeping and investment management fees paid by the plan.  Under DOL fee disclosure regulation, [fiduciaries] should be sure they receive service and fee information from each covered service provider, and they should diligently review this information as part of the reasonableness evaluation process." *Id.*

66.     "[Fiduciaries] must understand the content of the fee disclosure materials received from service providers.  If the disclosure is not clear, or if the plan sponsor believes the information is incomplete, they must request additional information or clarification.  **Additionally, the plan sponsor may have an**

---

[10] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

**obligation to inquire as to the availability of lower-cost investment alternatives, such as lower-cost share classes for mutual funds or the availability of collective trusts**."  Best Practices for Plan Fiduciaries," at 36 (emphasis added).

67.     For purposes of evaluating expense ratios of an investment, plan fiduciaries should obtain competitive pricing information (*i.e.*, fees charged by other comparable investment funds to similarly situated plans).  This type of information can be obtained through mutual fund data services, such as Morningstar, or with the assistance of the plan's expert consultant.  However, for comparator information to be relevant for fiduciary purposes, it must be consistent with the size of the plan and its relative bargaining power.  Large plans for instance are able to qualify for lower fees on a per participant basis, and comparators should reflect this fact.

68.     According to Vanguard, "[b]enchmarking is one of the most widely used supplements to fee disclosure reports and can help plan sponsors put into context the information contained in the reports." "Best Practices for Plan Fiduciaries," at 37.

69.     "The use of third-party studies provides a cost-effective way to compare plan fees with the marketplace. Plan sponsors may elect to engage a consultant to assist in the benchmarking process.  For a fee, consultants can give plan sponsors a third-party perspective on quality and costs of services.  It is important to understand the plan (*e.g.,* plan design, active or passive investment management, payroll complexities, etc.) as it relates to the benchmarking information in order to put the results in an appropriate context.  By understanding all of the fees and services, a plan sponsor can make an accurate 'apples-to-apples' comparison." *Id.*

70.     When conducting fiduciary reviews of the plan's investment menu, plan fiduciaries should document the relevant information gathered and considered for purposes of the investment review, as well as supporting evidence for any decision to continue or change investment options.  *See* "Best Practices for

16

Plan Fiduciaries," at 36 ("Plan sponsors should build a record to document the information and factors used to determine the reasonableness of plan fees.")

71.     Documentation of fiduciary reviews is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe the (i) fiduciary topics discussed, (ii) type of investment information considered for the fiduciary review, and (iii) the rationale for resulting investment decisions.  Any related documents or data considered for purposes of the investment review (*e.g.*, prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized.  Without proper documentation of the investment decision-making process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner.

72.     In order to meet the necessary standard of expertise, plan fiduciaries must seek independent advice whenever they lack the ability (either because of a lack experience or skills, or a conflict of interest) to conduct a reasonable, independent investigation and evaluation of the plan's investments themselves.

73.     While it may be necessary to seek the advice of consultants like Stifel, reliance on such is not a defense to a charge of imprudence and absolute reliance on expert advice is ill-advised.

74.     Plaintiffs have reviewed the Committee's quarterly meetings in 2019 and the first 2020 quarterly meeting during February 2020.  Plaintiffs have not been provided access to meeting minutes from prior years, but review of the handful of meeting minutes they have obtained plausibly demonstrate that the Committee did not employ a prudent process in monitoring Plan investments.

75.     Importantly, the Committee did not document any effort to give adequate attention to the high investment management fees charged by several of the Plan's investments, especially those managed by Voya.  The investment management fees charged by Voya for these funds were excessive in relation to comparable or nearly-identical alternatives. Materials reviewed at the Committee meetings focused

17

primarily on fund performance and provided little information about the investment management fees being charged by the Plan's investments. The Committee did not meaningfully review the investment management fees charged for the Plan's investments as indicated by the ***absence*** of discussions in meeting minutes about these fees, their benchmarks or the source for the benchmarks.

76.     To the extent the Committee chose and/or failed to remove higher cost shares of investment funds, the meeting minutes do not document the reasoning for doing so.

77.     There is also no documentation to indicate the Committee investigated whether the actively managed mutual funds in the Plan's investment lineup provided sufficiently greater benefits over available index fund alternatives to offset the higher costs of the actively managed funds. Nor is there evidence that the Committee ever conducted a Plan-wide comparison of the Plan's actively managed mutual funds with alternative index funds that were available to the Plan. The Committee's failure to meaningfully consider replacing the Plan's actively managed mutual fund options resulted in Plan participants paying much higher investment fees than was necessary.

78.     With regard to recordkeeping fees, the Plan's fiduciaries fared no better in their fee review process. There is no indication of the Plan fiduciaries evaluating the reasonableness of recordkeeping and administrative fees for the Plan.

79.     Review of the limited years of meeting minutes provides a small window regarding the Plan fiduciaries' lack of a prudent decision-making process but is far from enough to provide actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan during the entire Class Period, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments. This information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim

without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

80.     Nonetheless, for purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon the factors set forth above and the numerous factors set forth below.

81.     In sum, Defendants failed to leverage the size of the Plan to negotiate for: (1) lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period; and (2) a prudent payment arrangement/reasonable fees with regard to the Plan's recordkeeping and administrative fees.

**B.      The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner**

**(1) The Plan's Total Plan Costs Were the Highest in Its Peer Group**

82.     "Many types of services are required to operate a [defined contribution] plan, including administrative services (*e.g.*, recordkeeping and transaction processing), participant-focused services (*e.g.*, participant communication, education, or advice), regulatory and compliance services (*e.g.*, plan document services; consulting, accounting, and audit services; and legal advice), and investment management." [11]

83.     "In order to better understand the impact of fees," BrightScope, a leading plan retirement industry analyst, "developed a total plan cost measure that includes all fees on the audited Form 5500 reports as well as fees paid through investment expense ratios."  ICI Study at 55.

84.     Costs are of course important because "[t]he lower your costs, the greater your share of an investment's return."  Vanguard's Principles for Investing Success, at 17. [12]

---

[11] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2017* at 55 (August 2020) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf

[12] Available at https://about.vanguard.com/what-sets-vanguard-apart/principles-for-investing-success/

85.     One indication that the Plan was poorly run is its dismal ranking among peers when comparing total plan costs.  According to BrightScope, the Plan is rated in the "highest cost" category for retirement plans above $500 million in assets under management.[13]

**(2) Many of the Plan's Funds Had Investment Management Fees In Excess of Fees for Funds in Similarly-Sized Plans**

86.     Another indication of the Plan's poor management was the fiduciaries' selection of expensive funds for the Plan.  As noted above, the Committee did not document any effort to give adequate attention to the high investment management fees charged by several of the Plan's investments, especially those managed by Voya.  This is apparent when viewed through the lens of several benchmarks.

87.     As a starting point, investment options have a fee for investment management and other services.  With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

88.     Vanguard's white paper on investment management fees, "Vanguard's Principles for Investing Success," discusses the importance of minimizing costs.  Importantly, "[m]arkets are unpredictable.  Costs are forever."  *Id.* at 17.  Vanguard lays out four bullet points all investors must keep in mind: higher costs can significantly depress a portfolio's growth over long periods; costs create an inevitable gap between what the markets return and what investors actually earn – but keeping expenses

---

[13] *See* https://www.brightscope.com/401k-rating/552143/Spectrum-Health/572227/Spectrum-Health-System-403B-Plan/ (last visited September 4, 2020).

down can help narrow that gap; lower-cost mutual funds have tended to perform better than higher-cost funds over time; and indexed investments can be a useful tool for cost control. *Id.*

89.     Taking one year of the Class Period as an example, in 2018, the expense ratios for several funds in the Plan were more expensive than comparable funds found in similarly sized plans (plans having over 1 billion dollars in assets).  The majority of funds in the Plan (at least 14 out of the 20 mutual funds[14] or more than 70%) had expense ratios well above the median expense ratios for similarly sized plans.

90.     In some cases, expense ratios were up to *243%* (in the case of the Baron Growth Fund I) and a *317%* difference (in the case of (Invesco) Oppenheimer Dev Market Y) above the median expense ratios in the same category. The high cost of the Plan's funds is also evident when comparing the Plan's funds to the average fees of funds in similarly-sized plans. These excessively high expense ratios are detailed in the chart below:

| Fund in the Plan | Exp Ratio[15] | Investment Style | ICI Median[16] | ICI Avg[17] |
|---|---|---|---|---|
| Voya Solution 2025 Port Inst Fund | 0.74% | Target Date | 0.36% | 0.39% |
| Voya Solution 2035 Port Inst Fund | 0.77% | Target Date | 0.36% | 0.39% |
| Voya Solution 2045 Port Inst Fund | 0.80% | Target Date | 0.36% | 0.39% |
| Voya Solution 2055 Port Inst Fund | 0.80% | Target Date | 0.36% | 0.39% |
| Voya Solution Income Fund I | 0.68% | Target Date | 0.36% | 0.39% |
| Voya T Rowe Price Cp AprPt I | 0.64% | Domestic Equity | 0.30% | 0.35% |
| Baron Growth Fund I | 1.03% | Domestic Equity | 0.30% | 0.35% |
| Victory Small Company Opp I | 0.88% | Domestic Equity | 0.30% | 0.35% |
| Alliance Bernstein Small Cap Growth Z | 0.82% | Domestic Equity | 0.30% | 0.35% |

[14] While the 2018 and 2017 Form 5500s reference funds offered in connection with Newport Trust these funds appear to have a *de minimis* amount invested in them and may have been brought into the Plan as part of a merger and will be phased out in 2019.

[15]  The listed expense ratios are taken from summary prospectuses published in 2020.

[16]  *See* ICI Study at 74.

[17] *See* ICI Study at 67.

| Fund in the Plan | Exp Ratio[15] | Investment Style | ICI Median[16] | ICI Avg[17] |
|---|---|---|---|---|
| Mass Investors Growth R4 | 0.49% | Domestic Equity | 0.30% | 0.35% |
| Pioneer Equity Income Y | 0.73% | Domestic Equity | 0.30% | 0.35% |
| (Invesco) Oppenheimer Dev Market Y | 1.00% | Other Mutual Funds | 0.24% | 0.47% |
| Voya Clarion Real Estate Prt I | 0.71% | Other Mutual Funds | 0.24% | 0.47% |
| Voya Global Bond I | 0.63% | Other Mutual Funds | 0.24% | 0.47% |

91.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI Median and average fees are based on a study conducted in 2017 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for domestic equity funds for plans over $1 billion dollars in assets was 0.52% using 2015 data compared with 0.30% in 2017.  Accordingly, the median and average expense ratios in 2020 would be lower than indicated above, demonstrating a greater disparity between the 2020 expense ratios utilized in the above chart for the Plan's funds and the median and average expense ratios in the same category.

92.     Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan's funds because many prudent alternative funds were available that offered lower expenses than the median.

### (3) Failure to Utilize Lower Fee Share Classes

93.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally 1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

94.     Jumbo defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Qualifying for lower share classes usually requires only a minimum of a

22

million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for jumbo plans like the Plan.  *See, e.g., Davis et al. v. Washington Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).

95.     Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

96.     Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately."  *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

97.     Here, had the Plan's fiduciaries been faithfully reviewing the Plan's funds "quarterly to ensure they [were] meeting their established standards," SPD at 12, as they should have been, they would have selected the lower-priced identical funds.

98.     As demonstrated by the chart below, in several instances during the Class Period, Defendants failed to select the right share class of the Voya target date funds.  The Plan offered Voya solution, whereas Voya offered the I share and R6 share classes during the Class Period which cost less than the "solution"

and performed better as of the third quarter of 2020 at the 1, 3, 5, and 10 year intervals.  The alternative funds also performed better against the same benchmark:

| Fund | Incep Date | 2020 ER | Average Annual Ret % 1/3/5/10 | | | |
|---|---|---|---|---|---|---|
| Voya Sol 2035 I | 4/29/05 | .77% | 8.31% | 6.10% | 8.61% | 8.33% |
| Voya Targ Ret 2035 I | 12/20/12 | .46% | 9.18% | 6.71% | 9.01% | |
| Voya Targ Ret 2035 R6 | 12/21/15 | .45% | 9.21% | 6.74% | 9.00% | |
| S&P TD 2035 TR | | | 7.17% | 6.19% | 8.74% | 8.58% |
| | | | | | | |
| Voya Sol 2045 I | 4/29/05 | .80% | 9.09% | 6.01% | 8.87% | 8.74% |
| Voya Targ Ret 2045 I | 12/20/12 | .49% | 9.90% | 6.80% | 9.44% | |
| Voya Targ Ret 2045 R6 | 12/21/15 | .46% | 9.98% | 6.86% | 9.49% | |
| S&P TD 2045 | | | 7.14% | 6.26% | 9.23% | 9.03% |
| | | | | | | |
| Voya Sol 2055 I | 3/8/10 | .80% | 8.77% | 5.92% | 8.90% | 8.77% |
| Voya Targ Ret 2055 I | 12/20/12 | .47% | 9.92% | 6.78% | 9.54% | |
| Voya Targ Ret 2055 R6 | 12/21/15 | .47% | 9.84% | 6.81% | | |
| S&P TD 2055 | | | 7.07% | 6.26% | 9.50% | 9.31% |
| | | | | | | |

99.     The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

100.     In addition to the Voya target date funds, the Plan's fiduciaries also failed to select better performing, cheaper share classes of the following funds (the Plan's funds appear first):

| Fund | Incep Date | 2020 ER | Average Annual Ret % 1/3/5/10 | | | |
|---|---|---|---|---|---|---|
| Pioneer Strat Inc Y | 9/9/04 | .72 | 3.71% | 3.73% | 4.64% | 4.52% |
| Pioneer Strat Inc K | 12/20/12 | .62 | 3.72% | 3.84% | 4.75% | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Pioneer Eq Inc Y | 7/2/98 | .76 | -5.17% | 2.42% | 8.19% | 10.36% |
| Pioneer Eq Inc K | 12/20/12 | .66 | -5.06% | 2.55% | 8.31% | |
| | | | | | | |
| Invesco/Opp Dev Mar Y | 9/7/05 | 1.0 | 10.44% | 4.35% | 10.38% | 4.29% |
| Invesco/Opp Dev Mar R 6 | 12/29/11 | .83 | 10.60% | 4.51% | 10.56% | |
| | | | | | | |
| Mass Inv Gro R4 | 4/1/05 | .47 | 20.06% | 18.74% | 17.72% | 15.41% |
| Mass Inv Gro R6 | 6/1/12 | .38 | 20.17% | 18.84% | 17.84% | |
| | | | | | | |
| Prud HY Z | 3/1/96 | .54 | 2.83% | 4.71% | 6.88% | 6.60% |
| Prud HY R6 | 10/31/11 | .41 | 2.76% | 4.78% | 6.93% | |
| | | | | | | |

101.     The Plan funds' lag in performance is even greater than indicated in the above charts because the performance data does not reflect the amount of administrative expenses or revenue credits charged to the Plan participants that effectively lower the returns obtained by Plan participants.

102.     The individual fund and combined funds assets under management easily qualified them for lower share classes.  The following is a sampling of the assets under management as of the end of 2018:

| Current Fund | 2018 Assets Under Management |
|---|---|
| Pioneer Strategic Income Y | $10,286,271 |
| Mass Investors Growth R4 | $148,391,880 |
| Pioneer Equity Income Y | $47,934,216 |
| Prudential High Yield Fund Z | $8,814,099 |
| (Invesco) Oppenheimer Dev Market Y | $10,963,113 |
| Voya T Rowe Price Cp AprPt I | $140,888,144 |
| Baron Growth Fund I | $51,355,842 |

103.    A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.  Instead, here, Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received.  This reduced the likelihood that participants would achieve their preferred lifestyle in retirement.

104.    There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment. Defendants have no reasonable excuse for not knowing about the immediate availability of these lower cost share classes.  Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

105.    Indeed, because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds could not have (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.

106.    Additionally, fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing [to pay for recordkeeping]," *Tibble III*, 2017 WL 3523737, at * 11, especially in this case where, as described below, the Plan paid well-above market rates for recordkeeping.

107.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are

ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."   Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

108.     As explained below in discussing the recordkeeping and Plan administrative fees, the use of revenue sharing resulted in a worst-case scenario for Plan participants.

109.     Lastly, failure to utilize lower share classes during the Class Period violates long-standing DOL guidance which has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See*, "A Look at 401(k) Plan Fees," supra, at n.3.

110.     Also, failure to utilize lower share classes violates the Restatement of Trusts, which puts cost-conscious management above all else while administering a retirement plan. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" Tibble v. Edison Int'l, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (en banc) (quoting Restatement (Third) of Trusts, § 90, cmt. B.

111.     By failing to investigate the use of lower cost share classes Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.  Further, to the extent Defendants held revenue sharing amounts for a prolonged period of time and failed to remit any excess revenue sharing back to Plan participants, this was a further fiduciary breach that cost Plan participants millions of dollars during the Class Period.

### (4) Failure to Investigate the Benefits of Utilizing Lower Cost Passively Managed Funds over More Expensive Actively Managed Funds

112.    As noted above, there is no documentation in Committee meeting minutes to indicate the Committee investigated whether the actively managed mutual funds in the Plan's investment lineup provided sufficiently greater benefits over available index fund alternatives to offset the higher costs of the actively managed funds.  It is clear they conducted no such exercise.  This failure is a further indication that Defendants lacked a prudent investment monitoring process.

113.    While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.[18]

114.    Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis.[19]

115.    The majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019.

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark 5 Yr (%) |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 |
| Mid-Cap | S&P MidCap 400 | 63.56 |

---

[18] *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/getthere/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

[19] Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio")

| Small-Cap | S&P SmallCap 600 | 75.09 |
|---|---|---|
| Multi-Cap | S&P Composite 1500 | 82.79 |
| Domestic Equity | S&P Composite 1500 | 81.66 |
| Large-Cap Value | S&P Value | 84.74 |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 |

116. Digging deeper, other statistics bear out the vast underperformance of actively managed funds over passively managed funds over different stretches of 5 to 10 year periods beginning in 2008.

117. 77.97% of large-cap mutual fund managers and 73.21% of institutional accounts underperformed the S&P 500® on a gross-of-fees basis over the 10 year horizon between 2008 and 2018.[20]

118. The following chart denotes Domestic Equity-Percentage of Managers Underperforming over ten years as of December 31, 2018.[21]

| Category | Benchmark | Mutual Funds (%) Net/ Gross of Fees |
|---|---|---|
| All Domestic | S&P Comp 1500 | 84.49/75.58 |
| All L/C | S&P 500 | 85.14/ 77.97 |
| All M/C | S&P M/C 400 | 88.03/ 76.25 |
| All S/C | S&P S/C 600 | 85.67/ 76.01 |
| All Multi/C | S&P Comp 1500 | 86.36/ 77.90 |

119. It is the same story looking at different five-year intervals over the last decade. In 2015, over 76.23% of mutual fund managers and 85.81% of institutional accounts in the large-cap equity space

---

[20] *See* SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, September 18th, 2019 p. 1.

[21] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, September 18th, 2019, Exhibit 2, p.6

underperformed the S&P 500®. In the mid-cap space, 65.81% of mutual funds and 64.71% of institutional accounts underperformed the S&P MidCap 400®.  In the small-cap space, over 80% of managers on both fronts underperformed the S&P SmallCap 600®.  The findings in the small-cap space dispel the myth that small-cap equity is an inefficient asset class that is best accessed via active management.

120.    The following chart denotes Domestic Equity-Percentage of Managers Underperforming over five years as of December 31, 2015.[22]

| Category | Benchmark | Mutual Funds (%) Net of Fees | Mutual Funds % Gross of Fees | Inst. Accts % |
|---|---|---|---|---|
| All Domestic | S&P Comp 1500 | 88.43 | 79.85 | 85.00 |
| All L/C | S&P 500 | 84.13 | 76.23 | 85.51 |
| All M/C | S&P M/C 400 | 76.69 | 65.81 | 64.71 |
| All S/C | S&P S/C 600 | 90.13 | 81.11 | 81.82 |
| All Multi/C | S&P Comp 1500 | 88.56 | 79.67 | 83.20 |

121.    In 2016, in the large-cap equity space, 84.60% of mutual fund managers and 79.58% of institutional accounts underperformed the S&P 500® on a net-of-fees basis. When measured on a gross-of-fees basis, 68.16% of large-cap mutual funds and 69.20% of institutional accounts underperformed.

122.    Similarly, in the mid-cap space, 96.03% (86.24%) of mutual funds and 92.02% (82.51%) of institutional accounts underperformed the S&P MidCap 400® on a net (gross) basis.  In the small-cap space, over 80% of managers on both fronts underperformed the S&P SmallCap 600®, regardless of fees.

---

[22] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, July 31st, 2016, Exhibit 2, p.5.

123. The following chart denotes Domestic Equity-Percentage of Managers Underperforming over five years as of December 31, 2016.[23]

| Category | Benchmark | Mutual Funds (%) Net of Fees | Mutual Funds % Gross of Fees | Inst. Accts % N/G |
|---|---|---|---|---|
| All Domestic | S&P Comp 1500 | 82.87 | 67.11 | 76.31/65.52 |
| All L/C | S&P 500 | 84.60 | 68.16 | 79.58/69.20 |
| All M/C | S&P M/C 400 | 96.03 | 86.24 | 92.02/82.51 |
| All S/C | S&P S/C 600 | 95.64 | 81.40 | 90.61/78.91 |
| All Multi/C | S&P Comp 1500 | 89.31 | 77.67 | 81.31/70.33 |

124. In 2017, the majority of equity managers in 15 out of 17 categories underperformed their respective benchmarks over the 10-year horizon, gross-of-fees.[24] In the preceding ten years in the large-cap equity space, 89.51% of mutual fund managers and 73.61% of institutional accounts lagged the S&P 500® on a net-of-fees basis. When measured on a gross-of-fees basis, 71.97% of large-cap mutual funds and 62.88% of institutional accounts underperformed. Over 80% of mutual funds underperformed the S&P SmallCap 600® (net- and gross-of-fees) over the last decade, while 86.80% (72.92%) of institutional accounts underperformed on a net (gross) basis.

125. The following chart denotes Domestic Equity-Percentage of Managers Underperforming over ten years as of December 31, 2017.[25]

| Category | Benchmark | Mutual Funds (%) Net of Fees | Mutual Funds % Gross of Fees | Inst. Accts % N/G |
|---|---|---|---|---|
| All Domestic | S&P Comp | 86.65 | 71.20 | 71.11/ 59.88 |

---

[23] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, August 8th, 2017, Exhibit 2, p.5

[24] *See* SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, January 8th, 2019, p. 1.

[25] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, January 8th, 2019, Exhibit 2, p.5.

| | 1500 | | | |
|---|---|---|---|---|
| All L/C | S&P 500 | 89.51 | 71.97 | 73.61/ 62.88 |
| All /C | S&P M/C 400 | 96.48 | 85.37 | 85.16/ 77.01 |
| All S/C | S&P S/C 600 | 95.71 | 82.00 | 86.80/ 72.92 |
| All Multi/C | S&P Comp 1500 | 90.70 | 78.77 | 79.00/ 68.59 |

126.    Undeniably, fees play a major role in the active versus passive debate. After subtracting fees, returns from active management tend to be less than those from passive management, as the latter costs less.[26]

127.    "Vanguard's Principles for Investing Success," discussed *supra*, advises all investors that indexed investments can be a useful tool for cost control. *Id.* at 17.

128.    The Plan fiduciaries' clear bias in favor of selecting actively managed funds instead of constructing a balanced Plan investment menu – or even one weighted in favor of passively managed funds - reveals the fiduciary's belief that they could outperform what most active managers cannot and what passively managed funds do on a consistent basis.  From 2014 through February 29, 2020, at least 81.48% of the "designated investment alternatives" of the Plan were actively managed.

129.    The Defendants' actions in overwhelmingly favoring actively managed funds, plausibly show that they failed to consider the pros and cons of offering actively managed investments vs. passively managed investments.

130.    Specifically, Voya, the Plan's current recordkeeper,[27] offered lower cost better performing passively managed alternatives to the actively managed target date funds in the Plan.  Both the actively managed and passively managed target date funds have the same goal: "Voya's Target Retirement Funds

---

[26] Sharpe, William F., "The Arithmetic of Active Management" Financial Analysts Journal, January/February 1991, Volume 47 Issue 1. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs."

[27] In the SPD, Voya states that: "Voya is the only active investment provider for the Plan and is the recordkeeper of the Plan." SPD at 2.

are  designed to specifically balance the evolving risk return profiles of participants as they age to help maximize the probability of a successful retirement. The target date in the funds' name is the approximate date when investors plan to start withdrawing their money. These funds satisfy the criteria for qualified default investment alternatives (QDIAs)."[28]

131.    The Voya index funds performed better than their actively managed counterparts at the 1, 3, 5, and 10 year marks as of the third quarter 2020 and additionally performed better against the same benchmark:

| Fund | Incep Date | 2020 ER | Average Annual Ret % 1/3/5/10 | | | |
|------|-----------|---------|-------|-------|-------|-------|
| Vol Sol 2025 I | 4/29/05 | .74% | 8.28% | 6.24% | 7.88% | 7.67% |
| Voya Ind Sol 2025 I | 3/10/08 | .39% | 8.87% | 6.64% | 8.16% | 7.80% |
| Voya Ind Sol 2025 Z | 5/1/15 | .17% | 9.15% | 6.90% | 8.36% | |
| S&P TD 2025 TR | | | 7.10% | 5.97% | 7.86% | 7.73% |
| | | | | | | |
| Voya Sol 2035 I | 4/29/05 | .77% | 8.31% | 6.10% | 8.61% | 8.33% |
| Voya Ind Sol 2035 I | 3/10/08 | .39% | 8.93% | 6.88% | 9.17% | 8.78% |
| Voya Ind Sol 2035 Z | 5/1/15 | .17% | 9.29% | 7.12% | 9.40% | |
| S&P TD 2035 TR | | | 7.17% | 6.19% | 8.74% | 8.58% |
| | | | | | | |
| Voya Sol 2045 I | 4/29/05 | .80% | 9.09% | 6.01% | 8.87% | 8.74% |
| Voya Ind Sol 2045 I | 3/10/08 | .39% | 9.24% | 6.97% | 9.61% | 9.20% |
| Voya Ind Sol 2045 Z | 5/1/15 | .16% | 9.58% | 7.23% | 9.84% | |
| S&P TD 2045 | | | 7.14% | 6.26% | 9.23% | 9.03% |
| | | | | | | |
| Voya Sol 2055 I | 3/8/10 | .80% | 8.77% | 5.92% | 8.90% | 8.77% |
| Voya Ind Sol 2055 I | 3/8/10 | .39% | 8.97% | 6.83% | 9.58% | 9.19% |
| Voya Ind Sol 2055 Z | 5/1/15 | .15% | 9.21% | 7.06% | 9.81% | |

---

[28] *See https://individuals.voya.com/document/investor-guide/voya-target-retirement-fund-series-investor-guide.pdf*

| | | | | | | |
|---|---|---|---|---|---|---|
| S&P TD 2055 | | | 7.07% | 6.26% | 9.50% | 9.31% |
| | | | | | | |
| Voya Sol Inc I | | .68% | 7.42% | 5.72% | 6.12% | 5.59% |
| Voya Ind Sol Inc I | | .39% | 8.06% | 5.765 | 6.10% | 5.63% |
| Voya Ind Sol Inc Z | | .16% | 8.37% | 5.97% | 6.30% | |
| S&P TD Ret Inc | | | 6.86% | 5.40% | 5.72% | 5.25% |

132.     Failure to select the passively managed alternatives demonstrate the fiduciary failures of the Plan's fiduciaries because the funds sought to achieve the same goal with the passively managed funds beating the actively managed funds in every relevant category.  Moreover, because Voya was the Plan's recordkeeper, there is no reason why the Plan's fiduciaries should not have sought to add these lower cost alternatives at their earliest opportunity.

133.     Defendants' failure to investigate lower cost passive alternative investments during the Class Period cost the Plan and its participants millions of dollars.

### (5) Defendants Failed to Adhere to the Teachings of Modern Portfolio Theory

134.     Because a fiduciary must have the best interests of participants in mind, performance is defined, not just on an actual return basis, but quantified on an absolute and relative volatility basis which considers returns on a risk adjusted basis.  Fiduciaries utilize Modern Portfolio Theory (MPT) to make such assessments and the Committee utterly failed to select prudent investments for the Plan based on several criteria under the MPT.

135.     Modern trust law applies the "Modern Portfolio Theory" in evaluating a trustee's or fiduciary's investment choices and overall strategy. UPIA § 2(b) (Unif. Law Comm'n 1995); Restatement (Third) of Trusts § 90(a) (2007) ("This standard requires the exercise of reasonable care, skill, and caution, and is to be applied to investments not in isolation but in the context of the trust portfolio and as a part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to

34

the trust."). *See Birse v. CenturyLink, Inc.*,2019 WL 9467530, * 5 (D. Col. Oct. 23, 2019).

136.    Some of the metrics used to evaluate investments under the Modern Portfolio Theory are as follows:

- Returns - Absolute, relative to its peers, and against its respective benchmark.

- Beta - A measure of a fund's sensitivity to market movements.

- Standard Deviation - This statistical measurement of dispersion about an average, depicts how widely a mutual fund's returns varied over a certain period of time. Investors use the standard deviation of historical performance to try to predict the range of returns that are most likely for a given fund. When a fund has a high standard deviation, the predicted range of performance is wide, implying greater volatility.

- R squared - R-squared measures the relationship between a portfolio and its benchmark. It is simply a measure of the correlation of the portfolio's returns to the benchmark's returns

- Sharpe Ratio - It is calculated by using standard deviation and excess return to determine reward per unit of risk.  The higher the Sharpe ratio, the better the fund's historical risk-adjusted performance.

- Upside/Downside Capture Ratio - Upside/downside capture ratio show you whether a given fund has outperformed--gained more or lost less than--a broad market benchmark during periods of market strength and weakness, and if so, by how much.

- Information Ratio - A ratio of portfolio returns in excess of the returns of a benchmark (usually an index) to the volatility of those returns. Similar to Sharpe Ratio.  The information ratio (IR) measures a portfolio manager's ability to generate excess returns relative to a benchmark, but also attempts to identify the consistency of the portfolio manager.[29]

137.    According to a recent article, among the top ten modern portfolio criteria used in selecting core fund line-ups are:[30]

---

[29] The definition of these terms are available at https://www.morningstar.com/InvGlossary
[30]    *See*    2020    Planadviser    Retirement    Plan    Adviser    Survey,    available    at *https://www.planadviser.com/research/2020-planadviser-retirement-plan-adviser-survey/?pagesec=2*

- Performance v. benchmarks

- Total performance (5-yr return)

- Fee structure for plan

- Alpha, beta and standard deviations

- Upside/Downside capture ratio

- Sharpe ratio

138.     The following 5-Year Risk/Return Statistics as of third quarter 2020 demonstrate that the Voya target date funds in the Plan lagged behind both the lower share class actively managed funds and passively managed funds in key MPT metrics:

| Investment | Return | S/D | S/R | I/R | Beta | Up/down Capture | R2 |
|---|---|---|---|---|---|---|---|
| Voya Sol 2035 I | 8.61 | 12.37 | 0.60 | -0.09 | 1.07 | 103.48/107.10 | 99.00 |
| Voya Targ Ret 2035 I | 9.01 | 12.02 | 0.65 | 0.22 | 1.04 | 102.98/102.90 | 99.17 |
| Voya Targ Ret 2035 R6 | 9.00 | 12.04 | 0.65 | 0.21 | 1.04 | 102.99/103.00 | 99.14 |
| Voya Ind Sol 2035 I | 9.17 | 11.65 | 0.69 | 0.52 | 1.01 | 102.21/100.18 | 99.51 |
| Voya Ind Sol 2035 Z | 9.40 | 11.69 | 0.70 | 0.75 | 1.02 | 103.25/100.04 | 99.45 |
| S&P TD 2035 | 8.74 | 11.49 | 0.66 | | | | |
| | | | | | | | |
| Voya Sol 2045 I | 8.87 | 13.91 | 0.55 | -0.22 | 1.08 | 103.57/108.60 | 99.19 |
| Voya Targ Ret 2045 I | 9.44 | 13.54 | 0.61 | 0.17 | 1.05 | 103.72/104.67 | 99.40 |
| Voya Targ Ret 2045 R6 | 9.49 | 13.54 | 0.61 | 0.21 | 1.05 | 103.78/104.38 | 99.41k |
| Voya Ind Sol 2045 I | 9.61 | 13.22 | 0.64 | 0.41 | 1.03 | 103.07/102.31 | 99.58 |
| Voya Ind Sol 2045 Z | 9.84 | 13.23 | 0.65 | 0.64 | 1.03 | 103.81/101.91 | 99.56 |
| S&P TD 2045 | 9.23 | 12.84 | 0.63 | | | | |
| | | | | | | | |
| Voya Sol 2055 I | 8.90 | 14.23 | 0.54 | -0.40 | 1.07 | 101.85/107.28 | 99.27 |
| Voya Targ Ret 2055 I | 9.54 | 13.86 | 0.60 | 0.03 | 1.04 | 101.94/102.97 | 99.41 |
| Voya Targ Ret 2055 R6 | 9.57 | 13.85 | 0.61 | 0.06 | 1.04 | 102.06/102.96 | 99.45 |
| Voya Ind Sol 2055 I | 9.58 | 13.53 | 0.62 | 0.09 | 1.01 | 100.94/101.01 | 99.62 |
| Voya Ind Sol 2055 Z | 9.81 | 13.55 | 0.64 | 0.34 | 1.02 | 101.78/100.83 | 99.60 |
| S&P TD 2055 | 9.50 | 13.31 | 0.63 | | | | |

139.     Taking the Voya Sol 2035 I as an example, we learn the following from the above criteria. First, the returns for this fund is clearly the lowest among the funds.  After all, it had a higher expense ratio that than the other funds.

140.     Next, Sharpe Ratio, which factors in Standard Deviation but adds excess return to determine

the amount of reward the fund is getting per unit of risk shows the fund has the lowest number by far.  This is undesirable.

141.    Lastly, the higher the IR, the more consistent the manager.  Here, with the Plan's funds consistently had lower IRs relative to the other funds.

142.    To sum up, Defendants did not choose investments based on:

- investment returns, investment returns relative to peers, and investment returns relative to benchmarks;

- their sensitivity to market movements (Beta);

- how widely their returns varied over a certain period of time. In other words, they did not choose investments based on its implied volatility (Standard Deviation);

- their correlation of returns to its benchmark's returns (R squared);

- their excess return to determine reward per unit of risk (Sharpe Ratio);

- whether a given investment has outperformed--gained more or lost less than--a broad market benchmark during periods of market strength and weakness (Upside/Downside Capture); and

- the portfolio manager's ability to generate excess returns relative to a benchmark or the consistency of the portfolio manager (Information Ratio).

### (6) The Committee Violated the Plan's Investment Policy Statement

143.    Another indication of Defendants failure to follow a prudent process in selecting and monitoring Plan funds was their failure to follow the terms of the Plan's Investment Policy Statement ("IPS), effective August 2017.  The purpose of the Plan's IPS "is to assist the Investment Committee (Committee) in effectively supervising, monitoring and evaluating the management of the Spectrum Health System 403(b) Plan assets."  IPS at 2.

144.    The IPS states "[t]he Committee acknowledges fluctuating rates of return characterize the securities markets, particularly during short-term time periods. Recognizing that short-term fluctuations may cause variations in performance, the Committee intends to evaluate investment performance from a long-term perspective (five years or greater)." IPS at 3. Yet, the Committee allowed funds to remain in the Plan that had been outperformed as long as ten years. The Committee also selected actively managed funds over passively managed funds which was inconsistent with their obligations under the aforementioned provision.

145.    The IPS states the "Committee has determined it is in the best interest of the Plan's participants that performance benchmarks be established for each investment option. Manager performance will be evaluated in terms of an appropriate market index (e.g. the RusselHOOO TR USD index for large-cap domestic equity manager) and the relevant peer group (e.g. the large-cap blend mutual fund universe for a large-cap blend mutual fund)." *Id.* at 4. Yet, the Committee selected Voya target date funds that failed to beat the S&P Target Date benchmark and/or perform as well as other Voya funds compared to the S&P benchmark.

146.    The IPS states "[f]or multi-asset class investment options, such as target date funds, the asset allocation and glide path should be evaluated taking into account factors such as generally accepted investment theories and prevailing investment industry practices, the goals of the Plan, the philosophy of the fiduciaries regarding asset class diversification and the desired relationship of risk (or volatility) and potential return, and the needs and abilities of the participants and beneficiaries. The Committee will engage in a process to identify and consider those goals, preferences, needs and abilities and to select a default investment consistent with the analysis." *Id.* at 3. Yet, the funds selected by the Committee failed analysis under the MPT.

147.    For at least the foregoing reasons, the Committee violated the terms of the IPS.

      (7)    **The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period**

148.    Another result of Defendants' imprudent process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

149.    Spectrum's retirement plan is large and has scale which affords the Plan fiduciaries the opportunity to negotiate for lower recordkeeping costs.

150.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

151.    In this matter, using revenue sharing to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants for two independent reasons: it saddled Plan participants with (1) above-market recordkeeping fees and (2) an imprudent method for paying for those fees.

152.    Based on the Plan's form 5500 and fee disclosure statements, the Plan paid well-above market rates for recordkeeping and administrative costs during the Class Period:

| Plan Year | # of Plan Parts | Indirect RK Fees | Direct RK and admin fees | Cost P/P |
|---|---|---|---|---|
| 2019 | 32,805 | $2,804,780 | $2,493,295 | $161.50 |
| 2018 | 33,208 | $2,178,271 | $248,881 | $73 |
| 2017 | 30,756 | $826,353 | $874,887 | $55 |
| 2016 | 30,072 | $656,971 | $713,668 | $46 |

153.    Data for 2014 and 2015 are incomplete.  But a clear pattern emerged in the last five years showing that  the recordkeeping and administrative costs per participant have risen dramatically.

154.    The cost of providing recordkeeping services depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

155.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

156.    Further, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2019 Defined Contribution Progress Report at 10

("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process).[31]

157.    Defendants have wholly failed to prudently manage and control the Plan's recordkeeping and administrative costs by failing to try to obtain lower recordkeeping costs than what the recordkeeper was charging.

158.    By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

159.    The Plan had tens of thousands of participants making it eligible for some of the lowest fees on the market.  Recently, Fidelity – a recordkeeper for hundreds of plans - stipulated in a lawsuit that a Plan with tens of thousands of participants and over a billion dollars in assets could command recordkeeping fees as low as $14-21.  *See Moitoso v. FMR LLC*, 451 F.Supp.3d 189, 204 (D. Mass. Mar. 27, 2020).

160.    NEPC, a consulting group, recently conducted its 14th Annual Survey titled the NEPC 2019 Defined Contribution Progress Report (referenced above) which took a survey of various defined contribution plan fees.  The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other.  The average plan had $1.1 billion in assets and 12,437 participants.  The median plan had $512 million in assets and 5,440 participants.  *See* Report at 1.

161.    NEPC's survey found that plans with over 15,000 participants paid on average $40 or less in per participant recordkeeping, trust and custody fees.  Report at 10.

---

[31] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey.

162.    Another data source, the *401k Averages Book* (20th ed. 2020)[32] studies plan fees for smaller plans, those under $200 million in assets.  Although it studies slightly smaller plans than the Plans, it is nonetheless a useful resource because we can extrapolate from the data what a slightly bigger plan like the Plans should be paying for recordkeeping.  That is because recordkeeping and administrative fees should ***decrease*** as a plan increases in size.  For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant. *401k Averages Book* at p. 95.  A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant.  *Id*., at p. 108. Thus, the Plan, with over $1.6 billion dollars in assets in 2018 and over 30,000 participants in most years, should have had direct recordkeeping costs below the $5 average, which it clearly did not.

163.    The Plan's total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.[33]

164.    Lastly, the arrangement of placing revenue sharing funds into a revenue account before disbursement to pay for Plan expenses deprived Plan participants of use of their money and millions of dollars in lost opportunity costs.

---

[32] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information."  *401k Averages Book* at p. 2.

[33] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

165.     In other words, a more prudent arrangement in this case, also more transparent and easier to comprehend by participants, would have been to take advantage of the Plan's scale by selecting available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration fees.

166.     Given the size of the Plan's assets during the Class Period and total number of  participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

167.     A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars per year and constituted separate and independent breaches of the duties of loyalty and prudence.

### FIRST CLAIM FOR RELIEF
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against the Committee)**

168.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

169.     At all relevant times, the Committee and its members ("Prudence/Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

170.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence,

and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

171.    The Prudence/Loyalty Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.  Instead, the Prudence/Loyalty Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence/Loyalty Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.

172.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

173.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence/Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

174.    The Prudence/Loyalty Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**

**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Spectrum)**

175.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

176.    Spectrum (the "Monitoring Defendant") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and was aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

177.    In light of this authority, the Monitoring Defendant had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

178.    The Monitoring Defendant also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

179.    The Monitoring Defendant breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which Plan investments were evaluated and their failure to investigate the availability of lower-cost share classes; and

(c)      failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

180.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

181.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting

from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.


Dated: November 16, 2020                        Respectfully submitted,

By: /s/ *Mark K. Gyandoh*          .
Mark K. Gyandoh, Esquire
PA Attorney ID #88587
(*Pro Hac admission to be requested*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class

**CAPOZZI ADLER, P.C.**

By: /s/ *Donald R. Reavey*          .
Donald R. Reavey, Esquire
(*Pro Hac admission to be requested*)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

**ANTHONY L. DELUCA, PLC**

/s/ *Anthony L. Deluca*          .
Anthony L. DeLuca (P-64874)
14950 East Jefferson Avenue, Suite 170
Gross Pointe Park, MI 48230
anthony@aldplc.com
(313) 821-5905
Fax (313) 821-5906